# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAVON E. JOHNSON, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 14 C 10461 |
| UNITED STATES OF AMERICA, WARDEN S.M. KUTA, LT. CARL WILLIAMS, LT. GARY CROWE, OFFICER AHMAD HENDERSON, OFFICER ERROL MATTHEWS, OFFICER ANTHONY DEPAOLA, and DR. BRIJ MOHAN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Javon E. Johnson has sued the United States of America and several government employees under the Federal Tort Claims Act and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He alleges that while he was incarcerated at the Chicago Metropolitan Correctional Center (MCC), he was badly injured during an attack that correctional officers should have anticipated and failed to prevent. He also alleges that correctional officers and medical staff were deliberately indifferent to his medical needs arising from the injuries he suffered in the attack and that four correctional officers retaliated against him for attempting to seek administrative redress.[1]

---

[1] The Court thanks recruited counsel Thomas P. McGarry, Michael G. Ruff, Jessica L. Watkins, and Lauren N. Kus for their diligent service on Johnson's behalf.

The defendants have moved for summary judgment. For the reasons stated below, the Court grants the motion.

**Background**

The following facts are undisputed except where otherwise noted.[2] In April 2014, while Johnson was an inmate at the MCC, he and another inmate named Juan Frias were involved in a verbal altercation as they were returning from the MCC's visitation room. According to Johnson, the altercation escalated into a "tussling match" that included other inmates and drew the attention of correctional officer Anthony DePaola, although DePaola denies seeing any physical contact between Johnson and Frias.

After the altercation, DePaola ordered the other inmates to lock down and sent Johnson and Frias to see Lieutenant Carl Williams. Johnson and Frias told Williams that they had been arguing, not fighting. When asked if they would continue to have problems, Johnson and Frias responded that they were "cool." Williams told Johnson and Frias that if problems arose, he would put them both in the Special Housing Unit (SHU). At that time, MCC officials did not relocate Johnson or take any other special protective measures to ensure his safety.

About ten days later, while Johnson was sitting in the kitchen, Frias approached him from behind and hit him in the face with part of a wooden push broom. Correctional officers stopped the fight and sent Johnson to meet with the lieutenant on duty.

---

[2] Johnson did not file a response to the defendants' statement of undisputed material facts as required by Local Rule 56.1(b)(3). The Court deems the facts included in the defendants' Rule 56.1 submission admitted except to the extent that Johnson has disputed them in his response brief. *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710-11 (7th Cir. 2015) (upholding the district court's decision to deem certain facts admitted because the non-moving party did not comply with Rule 56.1).

Johnson informed the lieutenant that he thought his jaw was broken and requested medical attention, and the lieutenant sent him to be evaluated by nurse Alex Folami. Folami prescribed Johnson an antibiotic ointment and ibuprofen to treat his pain.

After Frias's attack, prison officials moved Johnson to the SHU. Johnson testified during his deposition that while in the SHU he submitted numerous sick call requests. He also testified that he complained to Lieutenant Gary Crowe and correctional officers Errol Matthews and Ahmad Henderson about his ongoing pain. And on May 8, he informed Dr. Brij Mohan, who was performing rounds in the SHU, that his requests for medical attention were being ignored.

Johnson was not evaluated for any of his complaints related to Frias's attack until May 15, about twelve days after he was placed in the SHU. The nurse who evaluated him noted his unexpectedly slow recovery, reports of severe pain, loose teeth, and sensitivity to palpation, and she ordered an x-ray. The x-ray was performed four days later on May 19, at which time Dr. Mohan examined Johnson and sent him to Thorek Hospital for additional evaluation and treatment.

At Thorek Hospital, Johnson underwent CT scans of his head and facial bones, which revealed one minimally displaced fracture and two nondisplaced factures in his face. Johnson testified that his treating physician at Thorek Hospital, Dr. Ahmed Raziuddin, told him that it was too late to do anything about the fractures because he had sustained the injuries two weeks earlier. Johnson contends that he continues to suffer headaches, vision problems, and other lasting injuries as a result of the attack and the delay in treatment.

Johnson brought this suit against Dr. Mohan, Williams, DePaola, Matthews,

3

Henderson, and Crowe, alleging that they violated the Eighth Amendment by failing to protect him from Frias's attack and deliberately ignoring his serious medical needs. Johnson also alleges that prison officials unconstitutionally retaliated against him for seeking administrative redress, naming Henderson and Crowe, as well as two additional employees—warden S.M. Kuta and Lieutenant Burning—as defendants. Finally, Johnson named the United States as a defendant on two claims under the Federal Tort Claims Act. The defendants have moved for summary judgment on all claims.

## Discussion

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a); *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.*

**A.** ***Bivens* claim for failure to protect**

Johnson alleges in count 1 of the third amended complaint that Williams and DePaola violated his Eighth Amendment rights by failing to take remedial steps to prevent Frias's attack. The defendants argue that this claim presents a new context for *Bivens* actions and that the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), precludes extending the constitutional remedy in this case. The Court need not decide this question, however, because even if Johnson's claim does not

constitute a new *Bivens* context, he has not pointed to evidence from which a reasonable jury could conclude that Williams and DePaola acted with a sufficiently culpable mental state.

An official may be liable for failing to protect an inmate in violation of the Eighth Amendment "only if the official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Liability for failure to protect an inmate has both an objective and a subjective element: the threatened harm must be objectively serious, and the official must have actual, rather than merely constructive, knowledge of the risk. *Id.* A prisoner typically establishes the requisite knowledge by showing that he complained to officials about a specific threat to his safety. *Id.; see also Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (holding that the plaintiff's "vague statements" that failed "to alert the officers to the fact that there was a true threat at play" were insufficient to show the requisite knowledge).

The record does not contain evidence from which a jury could conclude that Williams and DePaola knew about a specific and imminent risk of harm to Johnson. Unlike the plaintiff in *Gevas*, Johnson did not tell either Williams or DePaola that he felt threatened by Frias. To the contrary, both he and Frias made precisely the opposite representation by insisting to Williams that they were "cool." Johnson does not contend that he asked to be separated from Frias, nor does the record suggest that he sought any other special protective measures.

Johnson argues only that Williams and DePaola knew that Frias posed a substantial threat because they were aware that the two inmates "were involved in a

verbal altercation, which was serious enough for a crowd to gather and watch." Pl.'s Resp. to Defs.' Mot. for Summ. J., dkt. no. 193, at 6. But in this case, the fact that Williams and DePaola were aware of that altercation is not sufficient to permit a jury to conclude that they had the knowledge required for liability. In *Fisher v. Lovejoy*, 414 F.3d 659 (7th Cir. 2005), the Seventh Circuit held that there was insufficient evidence of the subjective element of the plaintiff's failure-to-protect claim at summary judgment even though, at the time of the attack, the officer had just broken up a fight in which one inmate repeatedly stabbed another. *Id.* at 663. The mere verbal altercation in the present case—which occurred days, not minutes, before Frias attacked Johnson with the broom—provides a far weaker basis on which Williams and DePaola might have inferred that Johnson's safety was at risk.

Even if defendants' awareness of Johnson and Frias's verbal altercation supported the inference that they knew Frias posed an imminent threat to Johnson, the inmates assuaged that concern when they told Williams that they were "cool" and would not have further problems. Awareness of the background facts "from which the inference could be drawn that a substantial risk of serious harm exists" is not sufficient for liability unless the official actually "draw[s] the inference." *Farmer*, 511 U.S. at 837. Here, the undisputed fact that both Johnson and Frias downplayed the possibility of future conflict before they were sent back to their cells suggests that Williams and DePaola did not in fact draw any such inference. *Cf. Fisher*, 414 F.3d at 663 (noting that the plaintiff's testimony that he was "shocked" to see another inmate draw a knife supported the conclusion that the defendant officer was likewise unaware of the risk). There is nothing in the evidence to suggest that Williams or DePaola believed, or even

verbal altercation, which was serious enough for a crowd to gather and watch." Pl.'s Resp. to Defs.' Mot. for Summ. J., dkt. no. 193, at 6. But in this case, the fact that Williams and DePaola were aware of that altercation is not sufficient to permit a jury to conclude that they had the knowledge required for liability. In *Fisher v. Lovejoy*, 414 F.3d 659 (7th Cir. 2005), the Seventh Circuit held that there was insufficient evidence of the subjective element of the plaintiff's failure-to-protect claim at summary judgment even though, at the time of the attack, the officer had just broken up a fight in which one inmate repeatedly stabbed another. *Id.* at 663. The mere verbal altercation in the present case—which occurred days, not minutes, before Frias attacked Johnson with the broom—provides a far weaker basis on which Williams and DePaola might have inferred that Johnson's safety was at risk.

Even if defendants' awareness of Johnson and Frias's verbal altercation supported the inference that they knew Frias posed an imminent threat to Johnson, the inmates assuaged that concern when they told Williams that they were "cool" and would not have further problems. Awareness of the background facts "from which the inference could be drawn that a substantial risk of serious harm exists" is not sufficient for liability unless the official actually "draw[s] the inference." *Farmer*, 511 U.S. at 837. Here, the undisputed fact that both Johnson and Frias downplayed the possibility of future conflict before they were sent back to their cells suggests that Williams and DePaola did not in fact draw any such inference. *Cf. Fisher*, 414 F.3d at 663 (noting that the plaintiff's testimony that he was "shocked" to see another inmate draw a knife supported the conclusion that the defendant officer was likewise unaware of the risk). There is nothing in the evidence to suggest that Williams or DePaola believed, or even

verbal altercation, which was serious enough for a crowd to gather and watch." Pl.'s Resp. to Defs.' Mot. for Summ. J., dkt. no. 193, at 6. But in this case, the fact that Williams and DePaola were aware of that altercation is not sufficient to permit a jury to conclude that they had the knowledge required for liability. In *Fisher v. Lovejoy*, 414 F.3d 659 (7th Cir. 2005), the Seventh Circuit held that there was insufficient evidence of the subjective element of the plaintiff's failure-to-protect claim at summary judgment even though, at the time of the attack, the officer had just broken up a fight in which one inmate repeatedly stabbed another. *Id.* at 663. The mere verbal altercation in the present case—which occurred days, not minutes, before Frias attacked Johnson with the broom—provides a far weaker basis on which Williams and DePaola might have inferred that Johnson's safety was at risk.

Even if defendants' awareness of Johnson and Frias's verbal altercation supported the inference that they knew Frias posed an imminent threat to Johnson, the inmates assuaged that concern when they told Williams that they were "cool" and would not have further problems. Awareness of the background facts "from which the inference could be drawn that a substantial risk of serious harm exists" is not sufficient for liability unless the official actually "draw[s] the inference." *Farmer*, 511 U.S. at 837. Here, the undisputed fact that both Johnson and Frias downplayed the possibility of future conflict before they were sent back to their cells suggests that Williams and DePaola did not in fact draw any such inference. *Cf. Fisher*, 414 F.3d at 663 (noting that the plaintiff's testimony that he was "shocked" to see another inmate draw a knife supported the conclusion that the defendant officer was likewise unaware of the risk). There is nothing in the evidence to suggest that Williams or DePaola believed, or even

that they should have believed, that Johnson was deliberately downplaying what had taken place or actual concern about future incidents.

Because Johnson has not introduced evidence from which a jury could conclude that Williams or DePaola had actual knowledge of a substantial threat to his safety, the Court grants summary judgment in favor of Williams and DePaola on count 1.

**B.** *Bivens* **claim for deliberate indifference to medical needs**

In count 2 of the third amended complaint, Johnson alleges that five defendants—Dr. Mohan, officers Henderson and Matthews, and Lieutenants Williams and Crowe—were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. To prevail on an Eighth Amendment claim of deliberate indifference, the plaintiff must show that he suffered from an objectively serious medical condition, the defendants were deliberately indifferent to that condition, and their indifference caused some injury. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

    **1.**     **Objective seriousness**

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton*, 593 F.3d at 620 (internal quotation marks omitted). Serious medical conditions include conditions that result in "unnecessary and wanton infliction of pain if not treated." *Id.*

A reasonable jury could conclude based on the evidence in the record that Johnson's injury was objectively serious. Johnson was attacked by another inmate who struck him in the face with part of a wooden broom. Photographs taken immediately

7

after the attack show a large gash on his face. He testified about severe pain, dizziness, loose teeth, headaches, and vision problems that persisted long after the incident, and CT scans later revealed that he had multiple facial fractures. This evidence is sufficient to permit a reasonable jury to conclude that Johnson's injuries mandated treatment or that if left untreated they could cause unnecessary and wanton infliction of pain.

The defendants argue that Johnson cannot establish that his fractures were objectively serious because they had not been diagnosed by a doctor during the period of the alleged delay. This argument carries the untenable implication that the delay of medical care, which is a central issue in this lawsuit and which Johnson says prevented an appropriate and timely diagnosis of his injuries—permits the defendants to escape liability. Defendants' reasoning is effectively circular. Moreover, their contention is contrary to the law: the lack of a diagnosis does not eliminate the duty to treat a serious medical condition. *See Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) ("[The plaintiff's] fracture need not yet have been diagnosed as such to have demanded action on the part of [the defendant]."); *see also Farmer*, 511 U.S. at 843 n.8 ("[A prison official] would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true.").

**2.  Deliberate indifference**

"[A] prison official's decision to ignore a request for medical assistance" can suffice "to show deliberate indifference." *Petties*, 836 F.3d at 729. A plaintiff may also show deliberate indifference by pointing to evidence that a physician's treatment decision "[is] so far afield of accepted professional standards as to raise the inference

that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (alteration in original).

Johnson has introduced evidence that would permit a jury to reasonably conclude that the defendants were deliberately indifferent to his serious medical needs. Johnson testified that he filled out several medical request slips and repeatedly complained of his severe pain to Dr. Mohan, Lieutenant Crowe, and correctional officers Matthews and Henderson, but did not receive medical treatment until more than a week later. Dr. Raziuddin further testified that Dr. Mohan's failure to examine Johnson in the SHU breached the standard of care. Drawing all reasonable inferences in Johnson's favor, this evidence would permit a reasonable jury to find that the defendants ignored a request to treat a serious medical condition and knowingly delayed treatment—a paradigmatic form of deliberate indifference. *See Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) ("Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment.") (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

The defendants argue that the "non-medical defendants" (meaning Henderson, Matthews, and Crowe) cannot be liable because they were not responsible for providing medical care to Johnson. It is true that defendants who lack medical expertise may reasonably "rely on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). They may not escape liability for deliberate indifference, however, if they "have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* In this case, Johnson's testimony that he repeatedly complained to the non-medical defendants that he was not

receiving medical treatment is sufficient to permit a jury to infer that the officers knew that his medical care was deficient and yet did nothing to resolve the problem.

The defendants also argue that Johnson lacks evidence of deliberate indifference on the part of Lieutenant Williams. Johnson acknowledged in his deposition testimony that he had misidentified Williams as a defendant in the claim of deliberate indifference in his second amended complaint, as Williams was not the lieutenant on duty that evening. Johnson has not accounted for this discrepancy, nor has he pointed to evidence that he ever complained of his injuries to Williams after being attacked by Frias with the broom. There is therefore no evidence in the record from which a reasonable jury could conclude that Williams was deliberately indifferent to Johnson's medical needs.

    3.    **Causation**

Johnson alleges that the delay in providing adequate medical treatment caused him to suffer "headaches, blurred vision, flashes and floaters, and chronic pain on the left side of his face where the trauma occurred, in addition to noticeable deformities to his facial cavity." Third Am. Compl. ¶ 39. The Seventh Circuit has held that "[i]n cases where prison officials delayed rather than denied medical assistance to an inmate, the plaintiff must offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Conley*, 796 F.3d at 749 (alteration in original) (internal quotation marks omitted).

    a.    **Long-term injuries**

Johnson cannot point to admissible evidence that the delay in treatment caused or exacerbated his long-term injuries. His evidence of causation consists of two alleged

statements by Dr. Raziuddin. First, Johnson says that Dr. Raziuddin said during his first evaluation that he could not help Johnson because it was "too late" to treat the injury, which had occurred two weeks earlier. But this statement—evidenced only by Johnson's deposition testimony recounting the evaluation—is inadmissible hearsay that cannot support Johnson's opposition to summary judgment. *See MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").[3]

Second, Johnson points to Dr. Raziuddin's deposition testimony that the delay in treating a facial facture can cause a "malunion" of the bones, which means that the fracture heals improperly such that the bones are out of alignment. But Dr. Raziuddin also testified that he had no memory of evaluating Johnson and could offer no opinion about whether Johnson's fractures had already begun to heal by the time his fractures were diagnosed on May 19. Moreover, Dr. Raziuddin testified that only a specialist—specifically, a radiologist—could reliably offer that opinion.

The undisputed testimony of the defendants' expert undercuts any inference that Johnson could have benefitted from an earlier surgical intervention. Dr. Jayant Pinto, a board-certified otolaryngologist (that is, a specialist in head-and-neck surgery), has opined that Johnson was not a candidate for facial bone surgery because his fractures were so minimally displaced and the risks associated with such a surgery would be substantial. Johnson has not introduced contrary "verifying medical evidence" that he could have benefitted from earlier surgical intervention or other treatment, as required to

---

[3] The Court notes that when asked directly, Dr. Raziuddin testified that he didn't think he had told Johnson that his injuries had become permanent and said that it wasn't his opinion that it was too late as of May 19 to do anything for Johnson. *See* Defs.' L.R. 56.1 Stmt., Ex. 20 (Raziuddin Dep.) at 26:8-22.

11

withstand summary judgment. *Conley*, 796 F.3d at 749.

Without any evidence that Johnson actually suffered from a malunion of his bones or that he was a viable candidate for facial bone surgery, no reasonable jury could conclude that the delay in treatment caused the long-term injuries he alleges in his complaint.

### c. Prolonged pain

Alternatively, even if Johnson has not provided evidence that his delay in treatment caused or exacerbated any injury, he can nonetheless survive summary judgment on the issue of causation by showing that the delay unnecessarily prolonged his pain. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). But Johnson has not introduced any evidence from which a reasonable jury could find that the pain treatment he received while in the SHU was deficient. After he was attacked by Frias, nurse Folami prescribed him 800 milligrams of ibuprofen to be taken twice daily. When Johnson was eventually referred to Thorek Hospital, his pain management regimen did not change appreciably; in fact, Dr. Raziuddin lowered the dosage of ibuprofen, though he instructed Johnson to take it as needed. The defendants' expert, Dr. Ward, concluded that the treatment of Johnson's pain at the MCC met or exceeded the standard of care. Without any contrary evidence, no reasonable jury could infer that the delay in treatment prolonged or worsened Johnson's pain.

Because Johnson has failed to introduce any evidence that the defendants' deliberate indifference either worsened his pain or caused him long-term harm, the defendants are entitled to summary judgment on count 2.

## C. *Bivens* claim for retaliation

In the third amended complaint, Johnson restates his claim that various defendants retaliated against him for seeking administrative redress. The Court has already granted summary judgment for the defendants on this claim because Johnson failed to exhaust administrative remedies regarding his claim of retaliation. *Johnson v. United States*, No. 14 C 10461, 2016 WL 3387156, at *8 (N.D. Ill. June 20, 2016). It appears that Johnson has kept this claim in his current complaint to preserve it for appellate review. As the Court has previously ruled, the defendants are entitled to summary judgment on count 3.

## D. FTCA claim for negligent failure to protect

Johnson also alleges that Williams and DePaola's negligent failure to take protective measures after his initial altercation with Frias entitles him to recover against the United States under the Federal Tort Claims Act (FTCA). The defendants argue that the decision not to separately house the inmates is covered by the FTCA's exception for any claim arising from acts or omissions by government employees "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a).

The discretionary function exception shields the United States from liability for the decision of government employee only if two criteria are met: first, the decision must have been discretionary in the sense that it involved an element of judgment or choice, and second, the decision must have been based on considerations of public policy. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014). To obtain summary judgment based on the discretionary function exception, the government

13

"must offer evidence that shows beyond reasonable dispute that its conduct was shielded by the exception." *Id.*

1. **Discretion**

The Seventh Circuit has held that the "determination as to where to house a federal prisoner is precisely the sort of discretionary act that falls within the discretionary function exception." *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018). In particular, decisions about whether to separate inmates for protective purposes involve require exercising discretionary judgment within the meaning of the FTCA exception. *See Calderon v. United States*, 123 F.3d 947, 949-50 (7th Cir. 1997). A decision is not discretionary, however, if the decisionmaker violated a mandatory policy; in that case, the employee "would not have made the kind of discretionary judgment the exception is designed to protect." *Keller*, 771 F.3d at 1024.

The government has provided uncontested evidence that shows beyond a reasonable dispute that the decision not to separately house Johnson and Frias was a discretionary decision protected by 28 U.S.C. § 2680(a). Unlike in *Keller*, there is no evidence which suggests that Williams or DePaola violated any statutes or regulations. Here, as in *Calderon*, the relevant Bureau of Prisons regulations do not impose any mandatory obligation to separate inmates, and instead commit that decision to the discretion of the prison officials. *See Calderon*, 123 F.3d at 949-50 (analyzing BOP regulations governing inmate discipline). For example, applicable Bureau of Prisons regulations state that an inmate "*may* be placed in administrative detention status" for several enumerated reasons, including a threat to his safety. 28 C.F.R. § 541.23 (emphasis added). Other regulations use similarly permissive language: 28 C.F.R. §

541.27 says that an inmate "may be placed in administrative detention status as a protection case" as a result of threats by other inmates.

The government also cites the affidavit of Raul Maldonado, who served as a captain at the MCC during the relevant time period. Maldonado asserts that MCC policy required corrections officers to determine whether there was a risk that warranted separating inmates before transferring one or both to the SHU. Maldonado's undisputed characterization of the MCC policy on inmate separation, together with the absence of mandatory BOP regulations, establishes beyond a reasonable dispute that the decision not to separate Johnson and Frias was committed to the correctional officer's discretion.

Johnson argues that the decision not to separate him from Frias is not protected by the discretionary function exception because there is insufficient evidence that Williams or DePaola "took note of the threats and weighed the relevant considerations." Pl.'s Resp. to Mot. for Summ. J., dkt. no. 193, at 9. But Johnson and Frias's testimony about their meeting with Williams establishes that he *did* inquire about the risk before deciding not to separate them. Johnson also cites *Keller* for the proposition that the discretionary function exception cannot apply because Williams and DePaola were negligent in their decision not to separate the two men. But the holding in *Keller* was much narrower: an official's negligence is relevant only to establish that the official failed to adhere to a mandatory policy that limited his discretion. *See Keller*, 771 F.3d at 1024. Indeed, Johnson's argument implies that the discretionary function exception does not apply to *any* negligence claims under the FTCA—a result that is impossible to square with cases like *Calderon* and *Lipsey*, where the Seventh Circuit applied the

15

discretionary function exception in FTCA negligence actions.

### 2. Public policy

Though the public-policy element is formally distinct from the discretion element, "we presume that the actions are grounded in public policy in cases where the statute or regulations allow the government agent to exercise discretion." *Calderon*, 123 F.3d at 950 (citing *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991)). Even without the benefit of that presumption, however, the government has provided evidence establishing beyond reasonable dispute that the decision not to separately house inmates is rooted in public policy. Maldonado explains in his affidavit that decisions regarding inmate separation require correctional officers to assess the magnitude of the risk. The Supreme Court has held that this type of judgment regarding risk is a core issue of public policy in the operation of prisons. *Id.* at 951 (citing *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979)). And the Seventh Circuit noted in *Lipsey* that security is among the relevant public policy concerns for the purposes of the discretionary function exception. *See Lipsey*, 879 F.3d at 255.

Because the decision not to separately house Johnson and Frias was committed to the discretion of the correctional officer and was based in public policy considerations, the United States is entitled to summary judgment on count 4 under the discretionary function exception.

### E. FTCA claim for professional negligence

Finally, Johnson asserts a claim of professional negligence against the United States under the FTCA. Specifically, he contends that Dr. Mohan and nurse Folami committed medical malpractice by improperly diagnosing him and delaying his

16

treatment. This claim requires Johnson to establish the elements of malpractice under Illinois tort law. *See Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred.") (internal quotation marks omitted). Illinois law in turn requires a plaintiff alleging a negligent delay in medical treatment to show a causal connection between the delay and the claimed injury. *Walton v. Dirkes*, 388 Ill. App. 3d 58, 60, 903 N.E.2d 18, 20 (2009). For the reasons explained earlier, Johnson has not introduced sufficient evidence to permit a jury to conclude that the delay in treatment caused his injuries. The United States is therefore entitled to summary judgment on count 5.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 189]. The trial date of January 14, 2019 and the final pretrial conference date of January 10, 2019 are vacated. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.

                                                                     _____
                                                                             MATTHEW F. KENNELLY
                                                                             United States District Judge

Date: October 24, 2018